May it please the court, I'm Richard Monaghan with Bordas & Bordas on behalf of the Relief Department, Lee Taylor, in this case. We submit that the District Court below misapplied the standards of review for Rule 12b-6, Motions to Dismiss, as well as the Rule 56, Motion for Summary Judgment. We also believe that the District Court below failed to consider that fraud and conspiracy claims are typically proven by circumstantial evidence and reasonable inferences to be drawn from that evidence. Rarely speaking, do defendants ever admit to engaging in fraud, rather orally or in written documents, or engaging in a conspiracy to commit such fraud. We also believe that the District Court failed to consider that knowledge of their officers, agents, and employees. And lastly, we believe the court failed to consider that members of a conspiracy are responsible for the acts of one another also. This case is brought under the False Claims Act. In this case, the District Court, in analyzing the claims at issue, we believe, failed to consider the allegations of the and also failed to give the realtor all reasonable inferences which may be drawn from such allegations. In this case, the first claim was an implied false certification claim, similar to what the United States Supreme Court dealt with in Escobar and what this Court dealt with in the Triple Canopy case. Specifically, in this case, in 2004, Dr. Thomas Mayer formed Best Practices in Virginia. Camden-Clarke Hospital in Parkersburg, West Virginia, contacted him about providing physicians and mid-level providers to their ER. At that time, Dr. Mayer Can I interrupt you? Sorry, just because I don't have time to get to it. Can you pivot and come back to this claim for a minute? I want to talk to you about Dr. Perini for a minute. These are sort of factual questions based on the record. So you allege in your complaint that he filled out this attending physicians box. Yes. And his testimony in deposition was that he denied filling it out. And so your allegation has been rebutted by his denial. Is there a material issue of fact on that point? So tell me why I can disregard his flat denial. He says, I didn't do it. Wasn't me. Yes. Well, because that's a credibility determination, which is normally for the trier of fact to assess. But you have to have evidence that goes against his claim, right? So he has an undisputed, or one might say, he has an undisputed statement. Your allegation doesn't count, right? That he didn't do it. Wasn't me. This court has case law, for instance, that acknowledges that a self-serving denial is not sufficient to defeat or it's not sufficient to obtain summary judgment unless there is objective, cooperative evidence in support of it. In this case, the defendants have not produced any evidence of anyone else that says they filled out that box. Yeah, but his objective evidence is that when you look at the check marks, they're a different handwriting, right? So when you look at the check marks in the attending box, they're different than the check marks that he made below. That's what he said in his testimony. And frankly, when you look at it, they're different. So, you know, that's some evidence, objective evidence that corroborates his denial. We would submit that just a mere check mark and saying it's different without handwriting experts coming in supporting that is not sufficiently cooperative to support that. Moreover, he says that when he signed this document, he didn't mark anything in the attending physician box. He left it. It was completely blank when he saw it. He didn't mark anything in it. He put a signature on it, and then he marked down below there, template complete. And that was the check mark that should have sent it to billing. Well, we know from what's been produced in this case that that's not what this record shows. It shows that the attending physician check being marked, it has a circle around the nurse practitioner, and then it has a section to go on to proceed about interviewing the patient, seeing the patient. Our expert, we have an expert, David Forrester, who says in this case that in order to be billed for a physician, for instance, seeing a patient, you have to have a face-to-face encounter. He says that Dr. Kearney should have at least marked somewhere in that attending physician box that he did not see the patient. There's no way for him to mark that, right? I mean, I'm just, let me just maybe ask a different way. Is there any other evidence that you would like for me to look at that you believe, other than the fact that when you get it in discovery, it includes a check mark that is contrary to his denial and the difference in the way the check marks look? I would say, I would ask your honor to consider two things. That's what I'm trying to get at. I mean, one, any of us, when I sign a bunch of letters in a stack, my last signature looks nowhere close to my first signature. I'm just saying that the fact that the check marks look slightly different, I don't think is strong enough evidence to support that he did not sign the above ones. Moreover, this court has case law where doctors are convicted of Medicare fraud for signing documents but leaving them blank, and then somebody else fills them in later. By signing that document without making sure that boxes that should have been checked and filled out were filled out correctly, he could be liable under the law for a crime, not just for civil liability. But your whole point is that if he filled that box out, it was false. I mean, that doesn't make any sense to me, because the box is only if he saw the person, and he didn't see them, so he would have to leave it blank. Our contention, though, is that best practices and best practices of West Virginia and the parent corporations instructed everybody in this emergency room to sign off on these charts, regardless of whether they saw the patient or not. And they did sign off on them, but not in the attending physician's box. Only if you believe his testimony and a reasonable inference for a jury. That's the evidence you've got that contradicts his testimony and the check marks. And the law of this jurisdiction notes that somebody can be convicted for signing a formal paper that's going to be submitted to the government for reimbursement and leaving things blank when they should be filled in properly. So what's the false statement is the question? Well, there's two. This particular one is an upcoding scheme. Because a nurse practitioner, for instance… I know we're going to go there, but I'm following up on Judge Richardson's question. If the box is blank and he didn't see the patient in their check, but if he didn't see them, what's the false statement here? I mean, one, he could fill out in the box that he did not see the patient, only reviewed the chart. But there's no space for him to do that, right? You want him to put an appendix to it, right? No, there is a line there that somebody could write, did not see patient. Well, wouldn't it mean the same thing if you don't check a box saying you saw him? Doesn't that mean you didn't see him? If you didn't fill that box in, and I take it from your perspective, we ought to just take it that he did fill it in because the check is there and the signature is up. Well, I mean, certainly as I indicated before, that before marking that check template box, he should have filled out everything that needed to be filled out. And there are legal requirements for not doing so. But it also gets into the whole scheme of what we're contending that's being done here. And that is… You know what makes it interesting is that box you're referring to is actually encased in another little black box sort of separate. And I'm thinking, he signs this thing, it's down in this signature below, and then he checks template. There's nothing that indicates that what he is signing is including what's in that black box because he didn't see him, so he didn't sign that. And that's according to him. But that's one reasonable inference, but it's not the only inference. That's not an inference. That's actually direct evidence. I didn't do it. I know. His testimony, though, but without other corroboration other than his testimony, I mean, there's been no evidence produced by anybody that anybody else filled that in or could have filled it in. The defendants, none of the defendants, none of the parties on the defense side have produced any testimony saying, no, he didn't do it, this person did. Yeah, but that's why the burden's yours, right? I mean, I get it's hard, right? I mean, I'm not disparaging that. But, like, I agree. If he didn't do it, somebody did. But somebody did, like, doesn't work, particularly in a Rule 9 context when you've got to plead it with particularity. And you've only alleged that he did it, best I can tell. Well, I mean, I think we let the factual circumstances, particularity, knowledge, and those type of things can be pled generally. But he was granted summary judgment later on. The court actually denied the motion to dismiss for Judge Perney. And he was later rolled upon summary judgment where the court believed his testimony and didn't look at any of the other possibilities of what we believe were reasonable inferences. In that regard. Now, but the claim is here is that they were telling all these doctors to review these charts, whether they saw the patients or not, so that they could be billed at the full physician rate. Rather than if a nurse practitioner did it, it would be 85%. Dr. Perney himself testified, for instance, that best practices did not permit nurse practitioners to sign for billing purposes. He says, now, that person, if the nurse worked at urgent care, and they went ahead and let them do the signature, they couldn't bill for the physician rate. Certainly, that's an inference that he knew the importance of this. He directed physicians to sign those medical charts to obtain payments at a higher reimbursement than would otherwise be allowed. Where is the indicia of reliability as to that assertion? Well, it's in the testimony. Anthony Kitchens was an employee of best practices that also was the medical director of the ER. He admits in his own affidavit that they were instructed to sign off on all the charts for billing purposes. Can I ask you about that? Because I found both this chart thing and the testimony confusing. So, Dr. Kitchens says we were told that doctors should sign them for billing purposes. But that's different from we should sign them so that they would be billed at the higher physician's rate. And it does seem like it says physician signature. A doctor is supposed to sign this thing. But that seems different, again, from saying the doctor was the attending. Those seem like two different things. They're set up differently on this form. That seemed to me to be the import of Dr. Kitchens' testimony that we sign off on it, the whole thing. But that does not signify that we were actually the attending physician. Aren't those two different things? They certainly can be, depending upon what their intent was and exactly what was said and what was told to these people. What have you, besides Dr. Kitchens' statement, which I think does not get you where you need to go, what else? I really don't understand this scheme. How is it supposed to work? Well, because by signing off and either leaving it black for somebody else to fill in the way they wanted to for billing purposes or filling it out yourself, it enables Martin Gottlieb and Associates to then go ahead and bill at the full physician rate, which requires a face-to-face encounter with the physician. So you're saying as long as a doctor signs off where it says physician signature. But let's say the doctor signs off, but there's no indication that the doctor actually was the attending. That's enough to get it billed? The allegation in your complaint is so long as a doctor signs that line, even if it's clear he's not the attending, this thing's going to get billed at the physician's rate? Certainly the attending box in this one was filled out with other things in. Yeah, just imagine hypothetically it's not. This is the part of your complaint I don't understand. It's not clear to me where you're alleging how Gottlieb decides how to bill these things and or where you're alleging that the whole thing turns on whether a doctor signs this line at the bottom that says physician signature. I mean, obviously, of course, what happened in this case, when you look at what was submitted, I mean, for instance, Martin Gottlieb put in, well, there's a couple other things in addition to the signature, but they put in a code to bill at the highest rate, which deals with a high degree of severity for the patient's condition, which could cause a serious risk to life or physiological function. And then they also put in the Q6 modifier for a locum tendens physician, a substitute physician. And with all that in there, Martin Gottlieb then went ahead and submitted the bill for a full physician rate, which is 100 percent of what could be charged under Medicare and Medicaid. Which paragraph of the complaint alleges that it is the signature and not the attending note that Gottlieb relies on to bill it at the doctor rate? I don't know that there is one paragraph that says just that by itself. Okay. If it is, I want to see it. If not, I totally get it. But that's what I think I'm trying to maybe get a different version of what Judge Harris is trying to get to. No, and I understand what you're saying. I mean, conceivably, if all that was done was the physician sign and nothing else was filled out in the attending physician box, is that something that got – certainly if Martin Gottlieb had not billed it to the higher rate. Now, of course, obviously there's a distinction between the doctor's liability and Martin Gottlieb's liability and then the other defendant's liability. But I think, I mean, hypothetically speaking, if there was only physician signature in the template complete box marked and there was nothing at all in the attending physician box, we haven't seen any cases. For instance, because the motions to dismiss were granted against these other defendants, we've not got the new discovery for any other records to see if that ever actually happened in this case. We don't know if that happened in this case and what would have been the result. But I do agree that, hypothetically speaking, Martin Gottlieb and associates could have just went ahead and submitted it at the nurse practitioner's signature and her national provider number, and then it would have been billed. But they went ahead and he added in Dr. Michael Boyko as being the physician, regularly scheduled physician, put in his national provider number when he was not even scheduled to work that day, period. And it was billed at the full rate. Well, I don't want to get stuck in this, but that sort of confused me too because it kind of sounded like the reason this was up-billed based on your own allegations had to do with which doctor's code number or ID number was involved and had nothing to do with anything on this form. And that assigns exactly what happened with Martin Gottlieb submitting the final bill. I mean, obviously, under the False Claims Act, you can have the records. You can have false records which are material to a false claim that's sent in for payment. Doesn't the Q6 code tell us that Boyko is not the doctor? I mean, what else does the Q6 code tell us? It would tell you that. It would tell you that there was a locum tenens physician substituting for that doctor. So an intelligent reader of the bill that's submitted would say, yes, this is Boyko's number, but Q6 tells us that Boyko is not the doctor and it was somebody else. All of that is known to whoever is getting the bill. Except that he was not a regularly scheduled physician for that day. He was never scheduled to work on that day. But I understand what Your Honor is saying. I mean, the Q6 does indicate that there was a locum tenens physician substituting for a physician. But it just so happened that Boyko was never scheduled to work that day and called in sick, and they needed somebody to substitute for him. Let's hear from your opposing counsel. You have some time in rebuttal to continue this. It pleases the Court. Brian Roark here on behalf of seven of the eight defendants at police. I'm here on behalf of Dr. Perny, Dr. Boyko, the best practices entities, Holiday Acquisition Corp., MCARE, and Envision. To pick up on the questions that the Court had focused on the summary judgment ruling in this case, it's important for the Court to appreciate the procedural posture and how we got to this point. The relator in the case is not a corporate insider or someone who worked at the company. The relator is a patient. She was treated at the hospital in 2012. She initially filed a medical malpractice lawsuit in state court. Sorry, not to cut off your procedural background, but can you answer the inverse, I think, of the question that I asked your colleague? So Perny says, nope, didn't do it. Wasn't me. And arguably supports that by saying in his deposition, look, the check marks look different even. It's not just me saying it. I've got some objective evidence of that. But help me understand why I wouldn't piece together, you know, sort of maybe three things, maybe only one of which matters. One, that it is completed when the time it's submitted, which means somebody did it. Two, Gottlieb, who is the other person in the chain, not person, literally, but the other link in the chain, says, I just rely on the forms to create the bill, right? Which maybe you imply from that that he didn't do it. Maybe there's an implication there. And then third and maybe weakest, I mean, it is signed by Dr. Perny. So why don't those three things do enough to create, and anything else your counsel said that you think is pertinent to it, but in particular those three things, to create a material issue of fact on that issue? The only claim that's brought against Dr. Perny is an A1B claim under the False Claims Act. The relator didn't bring an A1A submission of false claim. They alleged that Dr. Perny made a false statement. And so to your question, the district court dismissed the entire case but let the case go forward as to just Dr. Perny on this one issue of whether he made a false statement. We offered Dr. Perny's declaration. The relator chose not to depose Dr. Perny in the case. And so to hear the argument that this is a credibility issue, the relator had every opportunity to develop evidence, put Dr. Perny back in the case. The deposition we're reading is from the state court action? It's from the state court action that in the state court, the relator brought a billing fraud claim as well, did depose Dr. Perny in that case. The state court granted summary judgment to the defendants that billing fraud had not been established. To your question, as it relates to Dr. Perny, the testimony, what's in the record is he said that he reviewed the chart and he signed it. He signed it at 6 a.m. Ms. Taylor had been discharged at 4 a.m. So I think it's important and it's relevant. He didn't backdate it. He didn't say that he had seen her at 3 a.m. He reviewed the chart, which the testimony in the case was it was routine and commonplace for physicians to review the charts of extenders. Even the relator's expert agreed that there's nothing out of the ordinary, that doctors routinely review charts of nurse practitioners for licensure, for just that it's a good practice to see if they agree with the care. And so from the evidence that's before the court, there isn't evidence about who filled out the attending notebook other than Dr. Perny says, testified that he did not do it. And there's no evidence that contradicts that. So what do I do with the testimony that maybe it's a declaration from an employee at Gottlieb, I can't remember the name at the moment, who says in general, not specifically this form, in general, I, we, the company relies on these forms to prepare the bill. I don't think that that could tie back to liability with respect to Dr. Perny. Dr. Perny doesn't get paid more or less depending on how this particular claim is billed. His testimony was he was not involved in billing. He didn't know anything about how the claims were being billed. I understand what the court is saying as well, but look at how it did get billed. If this claim was billed incorrectly or billed in error, that doesn't establish False Claims Act liability with respect to Dr. Perny or any of the other defendants as well. The outcome of this case doesn't rise and fall on whether the claim was billed correctly or not. It rises and falls on as to the other defendants have facts been pled that show fraud with respect to those defendants. And for Dr. Perny, it would rise and fall on what what testimony and evidence was was developed in discovery in the case. Plaintiff's counsel said, well, there could have been handwriting experts. The fact of the matter is there there weren't. This is the record that we have before us. I just want one follow up question on the attending box. I thought I may be misremembering that the district court also thought. Whoever filled it in, it's also not a it's not a false statement. It circles NP. It would be weird if the point were to try to trick someone into thinking this patient was seen by a physician to circle NP or nurse practitioner. So the whole thing is too ambiguous at best to be a false statement anyway, regardless of whether Dr. Penry filled in the box or Perny. Sorry. Am I remembering right? Is that what the district court said? And do you have any? Do you agree? You are your honor. And not surprisingly, we do agree. It is it is simply too ambiguous to try to. So why is NP possessive then when it says in peace history reviewed? Why would we think that it would be a possessive NP? Who was taking action? It could be. I have you ever written a subject like that in a sentence that was possessive and sort of an odd. It'd be extremely odd way to write a sentence. Right. Right. It's it's I can't answer the question because I have to speculate to do it. I really don't know. And at the end of the day, it's not alleged. And then there was not proof on why was the box set up this particular way? How is it routinely used? How did Dr. Perny use it in this particular instance? I would love the certificate of authorization. Looks like to me, the state law says it's unlawful for you to practice. They did speak to that from the material requirement aspect. The underlying facts are that best practices of West Virginia did properly enroll and was properly incorporated. It's supposed to file an annual report and pay a twenty five dollar annual annual fee. It did not. There's not facts as to why they did it. Presumably some type of oversight. They did it. And then automatically under West Virginia state law, you don't file your annual report. You don't pay your fee. Your license is revoked. That also had the effect under West Virginia state law, as it's alleged in the complaint of nullifying best practices of West Virginia's medical corporation certificate of authorization. Accepting those facts is true. The two problems here is are that there's not materiality and there's not signature that's been pled as to either defendant on materiality. You can go down the line of all the factors that are laid out in the Escobar case. It doesn't this doesn't go to the heart of the matter. Do you agree, I assume, that if their license was suspended for Medicaid fraud, right? So if the HHS, either the state or federal level, suspended their license for Medicaid fraud, that that license suspension would be material? Yeah, in all likelihood, yes. The circumstances matter. If they had presented false information on on their application, if the application had been terminated because one of the underlying physicians shareholders lost their license to practice medicine. This is no different than a general business license that a taco truck or a soda shop has to have in order. If someone wants to operate under the corporate form, as opposed to being a sole proprietor, this is the certificate of authorization that's necessary under West Virginia law. The fact that that it was terminated or revoked for nonpayment of a fee doesn't relate to whether the services that were provided to Miss Taylor came from a qualified individual who was able to do that or not. And it stands in stark contrast to both the Escobar case itself, to Triple Canopy, to any other materiality case that that that we've reviewed or cited cited in our in our papers. This comes down to what were the facts alleged that support materiality. The argument, as we understand it from the relators, is more of, well, they did lose their business license. Ergo, we should be able to go forward and into discovery. And this court held in the U.S. Compton case, the mere fact of a regulatory violation is not enough in and of itself. Can you address just a second, at least the Gottlieb dismissal with respect to the high severity, just the narrow piece? Because it seems, at least taking the allegations at the motion to dismiss stage for this claim, that they allege that this cellulitis is not high severity, that the medical records show that. I take them at their word at that. And then Gottlieb billed it at as a high severity. And so it seems like based on the allegations there that they've alleged that that was false. Can you can you tell me why it was appropriate to grant a motion to dismiss, given that it seems the record establishes falsity? Maybe maybe not some other things. Yes, your honor. And I'll know my co-counsel represents Gottlieb. So I'm sorry. Is he coming up in a minute? Yes. Then save it for him. Don't answer for him. I'd rather him answer not answering for him. The same claim is brought with respect to the other defendants. They I would agree that they adequately alleged that the claim that was submitted was not correct. They adequately alleged facts saying it should have been billed at a lower level. They did not allege facts showing that that was was false. There's a difference under the False Claims Act. If you're going to impose the punitive damages that come from that. It's not enough simply to allege in a case that while this was billed out of nine nine two eight five, it should have been nine nine two eight four. You have to couple that with what did the defendants know? Was there some pattern or practice or even in this particular case? What are the facts showing that someone either knew actually or should have known that this claim was not billed at the at the correct level? In other words, based on the complaint, it could be negligent. It could be reckless or it could be fraudulent. But we can't tell. And if it's just negligent, that's not enough. I mean, they just could have made a mistake, right? It could have made a mistake. And I would disagree that it could have been it could have been reckless. It could have been fraudulent. There aren't any facts alleged showing that if we accept that the claim from Miss Taylor was not billed at the correct level. There are no additional allegations relating to the code that was that was provided. Again, typically these cases are being brought by by corporate insiders who'd worked in. So maybe you have testimony from employees who talk about. We were pressured to build things at a higher level than than than actually happened. Or or testimony about the company looked at reports and they monitored trends on what levels of code should have been pled. We don't we don't have that here. What what we have here instead is we're not necessarily into Charles Dickens Bleak House territory yet, but we're moving in that direction. This this case has evolved in numerous fashions over the years. And as Judge Berger, we would submit rightly found the plaintiff has not done anything to parlay their med mal lawsuit and claims into a lawsuit under the False Claims Act, either based on expiration of a business license or based on alleging some type of scheme to up code claims. The last thing I want to address, one of the other questions that went to Relators Council Relators Council argued that if you look at the complaint, that there are facts alleged in the complaint that Dr. Kitchens told Dr. Perny or others to sign off on the charts for for patients that were seen by mid levels in order to bill at a higher level. That is correct, with the exception of if you if this is in paragraph 167 of the complaint, what Dr. Kitchens allegedly told Dr. Perny is, yes, you need to sign off on charts seen by mid levels. The complaint doesn't allege that that was that what he told Dr. Perny was to do that so that the claim could be billed at a higher level. And the court below rightly found that the defend the Relator didn't satisfy pleading false claims, presentment of false claims, but also didn't didn't plead a scheme. There's no allegation about a scheme to submit false claims. And based on that, we would ask that the decision from the trial court be affirmed. I'm happy to answer any additional questions, or if not, we'll turn it over to Gotley's counsel. Thank you very much. We'll hear from your co-counsel. Good afternoon, your honors. My name is Robert Williams. I'm a lawyer from Tampa, Florida, representing Gottlieb in this case, as you know. To address the question, your honor, that you posed to Mr. Rourke, let me adopt his answer in full. He did a very good job. One has to put this in perspective because Gottlieb was dismissed based on a motion to dismiss at the pleading level. And the trial court, I thought, did a spectacular job of going through a rather voluminous complaint, multiple, multiple, multiple allegations of all kinds of things, and distilling it down to a simplistic analysis that you can't just allege these things generally and hope, and hope that through discovery you can fill in the blanks. Now, in a false claims case, particularly with 9B at stake, you've got to fill in those blanks in the pleadings themselves, the who, what, when, where, and why. In the perspective of Gottlieb, Gottlieb is not on the inside. It's a biller. It's a processor. It receives the records, as your honor said, and the person from Gottlieb apparently testified, and we take those records as they are, and we distill them into a bill, and we send the bill on to Medicare or Medicaid or to a private processor or payer, if the case may be. And what the relator is suggesting is that Gottlieb should peel the onion and distill from all of these records what the relator says is the underlying fraudulent truth, when in fact that is not the way it works, and they know that's not the way it works. And they're hoping, if they can get back into court, to figure out some way to prove this. We have to remember that in these false claims cases, in order to file the case in the first place, you have to submit a statement to the government, usually to the local U.S. Attorney's Office, and they determine whether they're going to intervene or not. And that statement, as your honors know, is filed within sometimes the day before, sometimes the week before you file your own complaint under seal. In this case, the government chose not to intervene. Now, I acknowledge that the fact that the government chose not to intervene, in and of itself, doesn't suggest that there's not a good case. I'm not going to take that argument, the inverse of what Justice Thomas said in the Escobar case. But, in this case, it does have some, I think, heightened materiality from the point of view of this argument. In that, this, as counsel said, is not your normal false claims case. Usually, that's from an insider. An insider who, in my experience at least, has assembled and marshaled a lot of facts along the way, so that they can present to the government the facts that will tell the who, what, when, where, and why, and allow the government to make their own assessment based on those detailed facts. Here, that's not the case at all. The relator is an outsider. She's a patient, and she's only one patient. So, you represent Gottlieb, so let me ask the question on Gottlieb. Gottlieb claims that it relies on the patient medical record to code the condition. And here, when we look at Taylor's record, it reveals a diagnosis of cellulitis. While she was coded for something totally different, an immediate significant threat of life, I think we all agree that general definition of cellulitis doesn't fit there. So, how is that sufficient? I mean, how is that not sufficient to establish a false claim as being? Excuse me, Your Honor. Yes. There were no facts, not conclusions, not general assertions, but facts that supported that Gottlieb or the human being at Gottlieb would be able to discern that from those medical records. It was signed by a doctor. There was a dialogue here with relator's counsel. An immediate life-threatening situation, even when you look at what the doctor signed. Looks like to me it says cellulitis. It would expect the person who is actually looking at that to try to read between the lines and determine exactly what the doctor is doing here. When the doctor signs off on it, I think it's fair to say and it's reasonable to assume that a person that looks at the records as a whole is not in a position to determine exactly if there's some underlying meaning here. The billing process here is not a position. I'm not following that, and I don't want to take too long here. If I go to the doctor and I sprain an ankle, and it says he sprained his ankle, and it shows up at Gottlieb, and Gottlieb says, I sprained ankle, we're going to code that as life-threatening. That would be, you know, incorrect, right? On the face of your honor's question, yes, Dan. And so I took Judge Lind's question to be, that's also true for cellulitis. Like an ankle sprain is not life-threatening, and yet your client coded it as being life-threatening. Because it was signed by the physician. I don't understand. Is everything signed by a physician coded as life-threatening? No, no, of course not. Okay, then I don't understand why was cellulitis signed by a physician coded as life-threatening? Well, I can't answer that question from a factual point of view, your honor. What I can say is that what they're trying to take is this discreet episode and manufacture it into a fraudulent scheme. And what the trial court determined was they didn't allege enough facts to support these conclusory allegations as to materiality and as to scienter. And to this entire upcoding scheme, as they would suggest, this one episode could be translated to 25,000 patients, the names of which we don't even know at this stage. And that's what Judge Berger did. Your time has expired, so thank you very much for your argument. We'll hear from Mr. Monahan as to have a little time for you. Thank you, your honor. Just going back briefly, I have the note, for instance, here, the language that we discussed about the attending physician's note and the signature line. I would note in regard to some of the prior questions, though, there's no signature inside the attending physician note for another signature. If you have one physician that disreviews, like the nurse practitioner's treatment, and that signature line is only for that, there's nothing inside it. There's an attending physician to sign in there. There's only one signature line. And one of the things our experts said is the way this is filled out by these people leads to it being incomplete or confusing and enabling Martin Gottlieb and those to do the upcoding because it doesn't specialize what happened and what the physician did. Did the physician merely, like, for instance, the only thing about checking, you know, looking at the plan is in the attending physician note. There's nothing down below where the physician's signature is for a line that says review chart or reviewed. So, I mean, the form itself is confusing the way these people are instructed to fill it out. Well, I guess I sort of had the same question, but I thought maybe it cut in a different direction. I didn't see anything in the even if we assume for a second that Dr. Perny filled out the attending box. I'm still not clear on what in the box is false because you're right, it doesn't say a doctor did this. Okay. Well, I mean, because the attending physician, if you look at its mark, the first check mark has resident and then as Judge Richardson pointed out, it has the NP possessive, history reviewed, but then it also says patient interviewed and examined. So, I'm sorry, so you think the check mark on the first line means that this was done by a resident or a PA? Well, I think what it means with it being checked like that is it's an indication that the nurse practitioners, the history was reviewed that the nurse practitioner took, but that the doctor himself or herself actually interviewed the patient and examined the patient. And that's one of the things about this form that's in our experts. I don't know. As you look at this box with that check mark, that check mark indicates that a resident, that a particular doctor reviewed the nurse practitioner's history or that some doctor, and you get that because resident slash PA means doctor? Well, the resident does, but because the attending filled it out and then the physician signed, I mean, according to our expert, that itself indicates that the physician was the attending and actually did the exam and looked at all this. Okay, so it's not what's in the box so much. It's the signature underneath the box that indicates that the doctor did the things in the box. Right. Not that what's in the box is false. Okay. I mean, I would argue that it's all important or all has relevance, but you're right that the signature line, because if they permitted the nurse practitioner just to technically be the attendant, all you would have is her signature, which is actually up above there in the record, and they call it the T-sheet. It's up above there. Right. The line right above is for the resident PA or NP to sign, right? So that's who's done all the work so far. And in the box below that, where it says attending note, physician signature, and template, is the doctor's piece. Right. And the doctor either checks that I've reviewed whichever one of those three signed on the line above, I've reviewed their history, I interviewed the patient, and I examined them, or they leave it blank indicating that they did not do that. Correct. I want to try to cover a couple of the other things here quickly. What do you mean correct? You mean if you leave it blank, that's okay to say he didn't do it? Isn't that your allegation that he made a false statement, but you think he actually did fill it out? And he said he didn't leave it blank. I mean we have alleged or we believe he did fill it out, and it's certainly a reasonable inference that he did fill it out. The only evidence is he didn't fill it out. Well, that's his testimony, but that's self-serving. Without any other cooperative evidence, that's not really enough to grant summary judgment. I guess Judge Richardson thought maybe the check mark looked different, so that was cooperative evidence, and I would disagree with that part. I feel like maybe I'm missing something, but feel free to explain it to me. So this would go to a jury and a reasonable jury. I guess the theory is he would come and testify and say I didn't fill out the box, and then your client would say, well, I think you did, and then a reasonable jury could find that he did. In the absence of any evidence that he did. I mean I guess that may be right. Maybe they would just think he was a big liar and discredit everything he said. Well, I mean going back to like Anderson v. Liberty Lobby, one of the Supreme Court's trilogy of summary judgment cases, not only are reasonable inferences something the jury can determine, but also credibility. And sometimes you've got to look at a person face-to-face and see them on the stand as to whether or not you choose to believe them, whether or not you find them credible. So yes, I would think, but I do want to, I know I'm past my time, but if I could discuss the false certification claim somewhat. I wasn't permitted. We're going to conclude at this point and want to thank both of you for, all of you for your wonderful arguments. Normally, as I said, we'd come down and shake your hands. This is our tradition. We'd love to do that, but we're not going to put you at rest nor let you put us at rest for a virus, but there will come a time when we will do so again. Thank you all for your time. Thank you.
judges: James Andrew Wynn, Pamela A. Harris, Julius N. Richardson